UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JAMES NOLLEY

_____

_____

_____

*(In the space above enter the full name(s) of the plaintiff(s).)*

-against-

_____

SWISS REINSURANCE AMERICA CORPORATION

_____

*(In the space above enter the full name(s) of the defendant(s).
If you cannot fit the names of all of the defendants in the space
provided, please write "see attached" in the space above and
attach an additional sheet of paper with the full list of names.
Typically, the company or organization named in your charge
to the Equal Employment Opportunity Commission should be
named as a defendant. Addresses should not be included here.)*

**COMPLAINT
FOR EMPLOYMENT
DISCRIMINATION**

Jury Trial: ☒ Yes ☐ No

*(check one)*

This action is brought for discrimination in employment pursuant to: *(check only those that apply)*



☒ Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e
to 2000e-17 (race, color, gender, religion, national origin).
   ***NOTE:*** *In order to bring suit in federal district court under Title VII, you must first obtain a
   Notice of Right to Sue Letter from the Equal Employment Opportunity Commission.*

☐ Age Discrimination in Employment Act of 1967, as codified, 29 U.S.C. §§
621 - 634.
   ***NOTE:*** *In order to bring suit in federal district court under the Age Discrimination in
   Employment Act, you must first file a charge with the Equal Employment Opportunity
   Commission.*

☐ Americans with Disabilities Act of 1990, as codified, 42 U.S.C. §§ 12112 -
12117.
   ***NOTE:*** *In order to bring suit in federal district court under the Americans with Disabilities Act,
   you must first obtain a Notice of Right to Sue Letter from the Equal Employment Opportunity
   Commission.*

☒ New York State Human Rights Law, N.Y. Exec. Law §§ 290 to 297 (age,
race, creed, color, national origin, sexual orientation, military status, sex,
disability, predisposing genetic chacteristics, marital status).

☒ New York City Human Rights Law, N.Y. City Admin. Code §§ 8-101 to
131 (actual or perceived age, race, creed, color, national origin, gender,
disability, marital status, partnership status, sexual orientation, alienage,
citizenship status).

*Rev. 05/2010*

1

## I.     Parties in this complaint:

A.     List your name, address and telephone number.   Do the same for any additional plaintiffs named. Attach additional sheets of paper as necessary.

Plaintiff     Name _____ James Nolley _____

Street Address _____ 1441 Seminole Road _____

County, City _____ Middlesex, North Brunswick _____

State & Zip Code _____ New Jersey  08902 _____

Telephone Number _____ 732.501.7616 _____

B.     List all defendants' names and the address where each defendant may be served.   Make sure that the defendant(s) listed below are identical to those contained in the above caption.   Attach additional sheets of paper as necessary.

Defendant     Name _____ Swiss Reinsurance America Corporation _____

Street Address _____ 55 East 52nd Street _____

County, City _____ New York, New York City _____

State & Zip Code _____ New York 10055 _____

Telephone Number _____ 212.317.3250 _____

C.     The address at which I sought employment or was employed by the defendant(s) is:

Employer _____ Swiss Reinsurance America Corporation _____

Street Address _____ 55 East 52nd Street _____

County, City _____ New York, New York City _____

State & Zip Code _____ New York 10055 _____

Telephone Number _____ 212.317.3250 _____

## II.     Statement of Claim:

State as briefly as possible the <u>facts</u> of your case, including relevant dates and events.   Describe how you were discriminated against.   If you are pursuing claims under other federal or state statutes, you should include facts to support those claims.   You may wish to include further details such as the names of other persons involved in the events giving rise to your claims.   Do not cite any cases.   If you intend to allege a number of related claims, number and set forth each claim in a separate paragraph.   Attach additional sheets of paper as necessary.

A. The discriminatory conduct of which I complain in this action includes: *(check only those that apply)*

_____     Failure to hire me.

☒     Termination of my employment.

_____     Failure to promote me.

_____     Failure to accommodate my disability.

_____     Unequal terms and conditions of my employment.

| X | Retaliation. |

_____   Other acts *(specify)*: _____.

**Note:** *Only those grounds raised in the charge filed with the Equal Employment Opportunity Commission can be considered by the federal district court under the federal employment discrimination statutes.*

B.   It is my best recollection that the alleged discriminatory acts occurred on: <u>01/2007 - 10/2007</u>.
*Date(s)*

C.   I believe that defendant(s) *(check one)*:

_____      is still committing these acts against me.

X      is not still committing these acts against me.

D.   Defendant(s) discriminated against me based on my *(check only those that apply and explain)*:

⊠   race   <u>African American</u>          ☐   color   _____

☐   gender/sex   _____          ☐   religion_____

☐   national origin   _____

☐   age.   My date of birth is _____ *(Give your date of birth only if you are asserting a claim of age discrimination.)*

☐   disability or perceived disability, _____ *(specify)*

E.   The facts of my case are as follow *(attach additional sheets as necessary)*:

I was hired in May 2005 as the Manager of Recruitment at Swiss Reinsurance America Corporation supporting the Capital Management & Advisory business unit.  I was responsible for developing programs and strategies designed to attract and retain financial services professionals from front-office sales, trading and research through middle and back-office operations, information technology and Finance.  In my first year with the organization, I was solely responsible for the hire of over 65 financial services professionals.  In addition to my duties as the Manager of Recruitment, I was responsible for the roll-out and communication of annual performance management programs, compensation analysis and valuations, employee relations management as well as training and development  (cont'd)

**Note:** *As additional support for the facts of your claim, you may attach to this complaint a copy of your charge filed with the Equal Employment Opportunity Commission, the New York State Division of Human Rights or the New York City Commission on Human Rights.*

## III.   Exhaustion of Federal Administrative Remedies:

A.   It is my best recollection that I filed a charge with the Equal Employment Opportunity Commission or my Equal Employment Opportunity counselor regarding defendant's alleged discriminatory conduct on: <u>July 31, 2008</u> *(Date)*.

*Rev. 05/2010*                                3

B.     The Equal Employment Opportunity Commission *(check one)*:

_____     has not issued a Notice of Right to Sue letter.

___☒___     issued a Notice of Right to Sue letter, which I received on _approx. 2/15/2010_ *(Date)*.

> *Note: Attach a copy of the Notice of Right to Sue letter from the Equal Employment Opportunity Commission to this complaint.*

C.     Only litigants alleging age discrimination must answer this Question.

Since filing my charge of age discrimination with the Equal Employment Opportunity Commission regarding defendant's alleged discriminatory conduct *(check one)*:

_____     60 days or more have elapsed.

_____     less than 60 days have elapsed.

## IV.     Relief:

**WHEREFORE**, plaintiff prays that the Court grant such relief as may be appropriate, including injunctive orders, damages, and costs, as follows: _I am requesting damages in the amount of $787,500.00 for lost wages._

_____

_____

*(Describe relief sought, including amount of damages, if any, and the basis for such relief.)*

**I declare under penalty of perjury that the foregoing is true and correct.**

Signed this _5th_ day of _October_, 20_10_.

Signature of Plaintiff _____

Address            1441 Seminole Road

North Brunswick, New Jersey  08902

_____

Telephone Number     732.501.7616

Fax Number *(if you have one)* _____

*Rev. 05/2010*                    4

**Continued from Page 3**

coordination.

During this period I was supervised by Mr. Raymond Barbieri, Senior Vice President, Human Resources. I received extremely positive evaluations and was even recommended for the firm's Leadership Development Program. During this period I developed and implemented "best-practice" solutions for the recruitment processes as well as automated the vendor management process. In addition, I was instrumental in the success of the firm's global initiative to attract graduate students to our graduates@swissre program.

However, early in 2007 things changed dramatically. During this period Mr. Raymond Barbieri was separated from the firm, our team was reorganized and I began reporting directly to Joanna Bardsley who was based in our London office. The New York team consisted of me, a Junior HR Generalist and an Administrative Assistant/Receptionist. The London team consisted of Ms. Bardsley, a Compensation Analyst (Mr. Tim Hodgson), a Recruitment Consultant and two Administrative/HR support staff. Initially, Ms. Bardsley held a weekly conference call as well as a one-on-one call with me to review any outstanding employee relations, recruitment and/or other ongoing issues. During the transition period I explained to Ms. Bardsley that Mr. Barbieri would include me in meeting with the CEO, Phil Lotz (who agreed it was a good idea) to review issues where my input would be germane. Ms. Bardsley indicated that she intended to continue this practice; however I was never again included in any such discussions. Instead Ms. Bardsley included Tim Hodgson, a white male, in these conversations and asked that he relay any information to the team.

While this was troubling, I became more concerned when a pattern began to emerge. Suddenly, more frequently I was either not included on email notifications and/or excluded from corporate HR meetings. I would not receive routine notes from Charlotte Gubler, the Global Head of Communications and HR or

communications from Americas Regional HR regarding off-site trainings held at our Westchester campus. When I addressed this with Ms. Bardsley she stated that she would " look into it". However, there was no follow up and following my exclusion from the Westchester meeting in August 2007, Ms. Bardsley had Mr. Hodgson travel to New York to visit with the Westchester staff to "build a better working relationship"

In late Spring 2007, Swiss Re announced a major restructuring of its' Financial Products division which would require a large-scale recruiting effort. I asked Ms. Bardsley, as the Manager of Recruitment, what my role would be in supporting this initiative. She became immediately agitated and hostile. The more I explained how my experience and background could be an asset to developing and executing an effective strategy, she only responded that she thought I was being "too aggressive" – a commonly held stereotype is that African-Americans are aggressive. However, during a subsequent conference call in May/June 2007 with the Divisional HR Leader, Don Stellwagon, the topic resurfaced. The participants on the call posed the exact same questions that I asked days earlier. Ms. Bardsley responded, albeit with little detail, cordially to all of their questions. However, as she concluded her response, having notice that Ms. Bardsley did not make any mention of my participation, Mr. Stellwagon's project coordinator asked pointedly: "When are you going to let the people responsible for recruitment know what the recruitment plans are? The remainder of the participants which included attendees from Legal, and HR concurred and Ms. Barsdley's only response was that she was working on developing a plan and would report back at a subsequent meeting.

However, again she dispatched Tim Hodgson to New York to query Hiring Manager's needs and develop a recruitment strategy/plan, excluding me from the process entirely. When a plan never materialized, the Hiring Manager's, who were based primarily in New York, began to reach out to me directly to begin recruitment for their openings.

I also began to notice a distinct and troubling pattern of behavior in Ms. Bardsley's interpersonal exchanges with me.  Whenever we spoke either during her visits to New York or over the phone she seemed uncomfortable, agitated and hostile.  She would immediately accuse me of being "aggressive" even if I asked simple questions – including those filtered through me from the staff and Managers I supported.  Given this behavior was evident both verbally and in writing I began to suspect that her discomfort was largely due to my race – in fact, she stated in a subsequent conversation that she did not understand "you people" and never behaved in this manner with other staff.  When I pressed her to explain her "you people" comment, she had no answer and simply changed the subject.  However, the context of the conversation was about me specifically and my ongoing role in the group.  On yet another occasion Ms. Bardsley sent an angry email accusing me of insubordination because I would not share, in writing and with several individuals outside of Human Resources, the intimate details of a potential employee's background investigation.

She followed this incident, with a conference call to me to "clear the air" in June /July 2007.  During the call I responded honestly by stating that I felt that she was continually hostile towards me and provided her with specific examples.  She became extremely angry and continued on this way for several minutes. I explained to Ms. Bardsley that these were my feelings and they were valid.

Again, in June/July 2007, I contacted the Divisional HR Leader, Don Stellwagon in an attempt address my ongoing issues regarding Ms. Bardsley's treatment.  I started the conversation and mentioned several times that I considered Ms. Bardsley's behavior biased and hostile.  I repeated these words several times and Mr. Stellwagon responded by stating "they were my feelings and they were valid" and that he would arrange a meeting with the three of us to determine how to move forward together – this meeting never occurred.  Also during this conversation I indicated to Mr. Stellwagon that Ms. Bardsley shared no information regarding the planned hiring strategies or how I might assist in any way.  And,

that Hiring Managers were continually asking me for answers to the very questions I posed to Ms.

Bardsley, however she would continually revert back to a position that I was being too "aggressive".

In July/August 2007 Ms. Bardsley informed me that she had hired a replacement for Mr. Barbieri an

individual named Gordon Cook.  Interestingly, it was never made public that this opportunity was

available or that a search was underway – at least not to me.  While Mr. Cook, a white male, had

significantly less HR experience than me generally, he had no direct financial services experience that

related to Swiss Re Capital Management & Advisory business lines.  As stated previously, our business

was primarily a capital markets sales, trading and research operation.  Mr. Cook worked, as a consultant,

for two years at defunct private banking concern supporting staff that was transitioning prior to the unit

being sold.  I had to explain the very basic elements of our operations - from the instruments

(derivatives, etc.) to trading strategies as well as the specific roles, responsibilities and requirements of

staff.  In fact, Mr. Cook provided assistance only with recruiting administrative and support staff.  He had

no knowledge of equity valuations, so he could not construct compensation or employment offers, he

possessed limited understanding of employee relations within financial services and he lacked a

grounded understanding of immigration issues so he could not address global mobility issues.  In fact, all

of these issues were vetted through me before he could respond.  In contrast, I have over 15 years of

direct experience with financial institutions such as JP Morgan, Credit Suisse and Deutsche Bank.  Every

major hire, from Distressed Debt to Weather Derivatives and Insurance-linked securities was handled

directly and successfully by me.

Mr. Cook did serve one purpose.  Shortly after my complaints of hostile and biased treatment, I received

a 45-Day Performance Improvement Plan from Mr. Cook and Mr. Stellwagon.  The Plan asked in many

instances that I improve the very skills that I was praised for demonstrating in my previous evaluations.

For example, the Plan stated that I "hinder the recruiting process rather than enable it"  By contrast, my

previous review states, "James has been instrumental in helping CMA HR reach goals in relation to the parent company needs" and "James has been both a resource and a guide for the other recruiters"

The Plan criticized my knowledge of the state of recruiting when I had been stating all along that Ms. Bardsley was not sharing any information regarding the recruitment efforts.

After giving me the Plan neither Mr. Cook nor Mr. Stellwagon met with me to discuss progress or provide any feedback. Accordingly, I believe the Plan was established solely to terminate my employment. On October 5, 2007 five days after the Plan expired I was terminated.

The stated rationale for my termination was that I was unable to establish and foster positive relationships with recruitment vendors. This was mere pretext. Notwithstanding the fact that I had just completed two major searches with Korn Ferry International – the parent company of Futurestep, the firm hired by Ms. Bardsley – hiring our General Counsel as well as an Equity Derivatives Attorney, Futrestep's lack of experience recruiting financial services professionals resulted in their performance failures. In addition, Ms. Bardsley's relied on Catherine Cloake – a white female with no recruitment experience – to negotiate and manage the deliverables of their engagement with Swiss Re. The project was so mishandled that I had to personally salvage two hires that Futurestep handled so poorly their candidates would not return Futurestep phone calls and would only speak with me. In addition, I determined along with the Managing Director of Operations that Futurestep was attempting to inflate the cost of services for one of the critical Calypso consultants – another candidate who would not accept calls from Futurestep that I convinced to join our Swiss Re team. When Futurestep learned that Hiring Managers were coming to me directly and that I had successfully recruited candidates for openings they believed were part of their mandate they became frustrated and confrontational. And shortly after my termination, Swiss Re fired Futurestep which demonstrates that Swiss Re was not satisfied with their performance overall which had nothing to do with me. In fact, on the day of my termination a senior

Hiring Manager in Information Technology wrote to me complaining that Futurestep's handling of his hiring mandate was giving him "night terrors"

Finally, none of my actions warranted termination as they were part of established recruiting procedures at Swiss Re.  Based on this and all of the above, I believe that I was discriminated against because of my race and in retaliation for asserting my legal rights.

# EXHIBITS

A

Swiss Re

**2005**

# SWISS RE CAPITAL MANAGEMENT AND ADVISORY
## PERFORMANCE ASSESSMENT FORM

Employee Name    James Nolley

Date    November 23, 2005

Position    VP Human Resources

Appraisers Name(s)    Raymond Barbieri

*Rate the employee on each criterion using the scale below. Support your ratings with comments.*

Superior – Sets new standards for high performance.

Exceeds expectations - Contribution is above expectations overall. Performance regularly exceeds standards.

Meets expectations – Performance consistently meets standards and occasionally exceeds standards.

Below expectations – Marginal performance is inconsistent and sometimes below standards.

Unacceptable - Contributions fall short of expectations. Performance is below acceptable standards.

N/A (Not Applicable) - If category does not apply or if employee is too new to rate.

Keys to Using the Rating Scale: Capital Management and Advisory's standards are characterized by high performance, continuous improvement and the pursuit of new initiatives. While areas for improvement should always be pointed out, it is important that this is done for employees receiving a *Below expectations or Unacceptable* rating on individual criteria or as an overall evaluation.

| PERSONAL EFFECTIVENESS | | RATING | | | | |
|---|---|---|---|---|---|---|
| | S. | E | M | B | U | N/A |
| Work Product – Produces thorough and accurate work in reasonable time parameters. | | | X | | | |
| Client Service - Tasks are undertaken with the goal of satisfying the business' needs in a proactive manner. | | | X | | | |
| Personal Motivation – Strives for continuous self-development. | | X | | | | |
| Communication Skills - Expresses ideas clearly and effectively both verbally and in writing. Exhibits active listening skills. | | X | | | | |
| Initiative - Seeks different ways to handle tasks, generates new ideas and improves existing processes. Works around obstacles. Gets things done with little guidance or instruction. | | X | | | | |
| Judgment and Decision-Making - Assesses situations and defines issues accurately; takes the appropriate course of action. Shows sound judgment when making decisions. | | | X | | | |
| Organizational Skills - Plans, prioritizes and manages tasks and projects effectively. Uses time productively. | | | X | | | |

Comments:
James has proven to be a highly productive individual. His work product has not gone unnoticed by senior management and line managers. James has been able to handle most matters that have crossed his desk. In the six months that James has been here he has upgraded the recruitment back to a functioning level and is perceived as the "go to" person in this arena. In the last few months there has been a noticeable change in the quality of James's organizational skills and management of people's expectations. This should remain an active goal. Developmental areas: continue to expand knowledge in employee relations and apply solutions and advice to managers as needed. Develop listening skills to better relate to staff as a resource.

Swiss Re

| CITIZENSHIP | RATING | | | | | |
|---|---|---|---|---|---|---|
| | S | E | M | B | U | N/A |
| Integrity – Demonstrates highest standards of professional conduct. Honest, transparent and acts to maintain and enhance the reputation of Swiss Re. | | X | | | | |
| Teamwork - Cooperates with and supports others. Exchanges ideas and offers expertise. Interacts well with others within the department and Firm. | | X | | | | |
| Influence - Persuades others in a way that positively impacts work. Is willing to incorporate feedback that improves own work. | | X | | | | |
| Problem Resolution – Resolves issues and handles problems in an efficient and timely manner. Confronts problems in an effective, direct and constructive manner. | | | X | | | |
| Professionalism, Behavior and Work Ethic - Displays perseverance and follows through on projects, accomplishes challenging goals and maintains high performance standards. Demonstrates appropriate business behavior, confidence, dependability and ability to handle stress. Respects the Firm's resources. Maintains high standards. Good record of attendance and punctuality. | | X | | | | |

Comments:
James is a strong team player and is active in offering ideas to develop HR. James has suggested that we adopt a mission statement and hold an off site to identify issues and develop solutions to improve the perception of HR. James is a highly intelligent individual and is quick to understand an issue or problem. The flip side of his abilities is that he needs to recognize that not everyone is a quick as he is.

| VALUE CREATED TO BUSINESS UNIT | RATING | | | | | |
|---|---|---|---|---|---|---|
| | S | E | M | B | U | N/A |
| Achievement of Business Objectives – performance during the year and specific value created. | | X | | | | |
| Tangible Contributions – Helps generate high quality revenues and/or contributes to cost efficiency. Adds to overall business productivity. | | | | | | X |
| Effect on Business – identifies and helps establish sufficient processes and controls to achieve business objectives; i.e. revenue targets, infrastructure development, etc… | | X | | | | |
| Area Expertise - Demonstrates special skills and knowledge specific to job in execution of function, goal attainment and measurable deliverables. | | X | | | | |
| Technical/Computer Skills - Demonstrates a working knowledge of computers and technology. Leverages knowledge to enhance job performance. | | | X | | | |
| Knowledge of the Business Unit – Knows the structure of Capital Management and Advisory and understands how job responsibilities impact the bottom line. | | | X | | | |

Comments / Examples of Value Added:

Continue to broaden understanding of CMAs products and services, as well as becoming more recognized as an internal expert in the field or recruitment and employee relations. Expand upon ability to manage decision makers through organizational changes.   Develop a plan to broaden his exposure to the HR community in Armonk, as well as key individuals in Zurich and London.

| MANAGEMENT PRACTICES        Complete this section for all employees who have managerial responsibilities | RATING | | | | | |
|---|---|---|---|---|---|---|
| | S | E | M | B | U | N/A |
| Defines Expectations - Establishes clear, specific performance goals for the department and employees. Supports staff in pursuit of these goals. | | | | | | X |
| Delegation - Delegates appropriate responsibility and authority for tasks. Keeps abreast of key activities without excessive checking up. Uses delegation as a tool to help employees develop. | | | | | | X |
| Performance Coaching - Provides training, career development and skill-building opportunities for staff. Provides on-going feedback. Conducts regular, comprehensive reviews. Remains fully informed on employees' strengths and weaknesses to provide meaningful feedback. | | | | | | X |
| Creates a High Performance Team – Motivates individuals to push themselves beyond what they thought they could do. Pools individual strengths to yield high performance teams committed to working together. | | | | | | X |

Comments:

N/A

Swiss Re

| TRAINING | RATING | | | | | | |
|---|---|---|---|---|---|---|---|
| | S | E | M | B | U | N/A |
| **Actively demonstrate continuous learning and development** - Has undertaken sufficient training /professional development (i.e on the job, in-house or external training) to maintain and develop competence and performance capability for the role undertaken. | | | X | | | | |

**Comments:**
To investigate external programs that would broaden his skill sets in HR.  If James's performance continues he would be a candidate to be nominated to the Leadership Develop Program.

**Major Strengths and Contributions:**

- Intelligent
- Quick study, has developed a broad basis and understanding of our business
- Regarded as a contributor by line managers and displays a keen interest in the needs of various departments
- Solution oriented.  Focuses on developing win – win situations
- Skilled and competent in the area of recruitment and how best practices impacts the financial viability of the firm
- Plays an active role in HR and cares about the team and function
- Feedback on James has mostly been positive, as mentioned above needs to step back at times to allow people to absorb and digest what he is proposing.

**Areas for Improvement/Development:**

- Develop listening and monitoring skills
- Expand upon becoming more of a generalist resource to all staff levels
- Pursue relationship building within the HR community, as well as line mangers in NY and London to build greater synergy.
- Continue to provide ideas on how the HR function needs to develop

*Managers should work with the employee to create a development plan that targets leveraging strengths, areas for improvement, and meeting future business needs and career aspirations. See overleaf.*

| OVERALL PERFORMANCE RATING (AN AVERAGE OF THE ABOVE RATINGS) |
|---|
| [ ] Superior   [X] Exceeds expectations   [ ] Meets expectations   [ ]Below expectations   [ ] Unacceptable |

Swiss Re
☰

*I have shown and discussed this review with the employee:*

Manager Signature _Key mark ~~~_   Date _12/6/05_ _____

Appraisers _____

(Manager should list all individuals who provided feedback on review)

Employee Signature _~~~ N~~~_   Date _06 - Dec - 06_ _____

(Employee signature acknowledges that a discussion of this document has taken place, but does not indicate that the employee necessarily agrees with the performance review. The employee should feel free to attach any comments relating to this review)

B

# End of Period Review - Manager Assessment: James Nolley

Last Modified : 05.03.2007 18:36:28 by  Raymond Barbieri

Swiss Re

## General Information

| | | | | |
|---|---|---|---|---|
| James Nolley | | | | |
| New York | | Operations | | |
| Raymond Barbieri/SwissRe | | | | |
| Gay Burns/SwissRe | | | | No |
| Manager, Recruitment | | Donald Stellwagen/SwissRe | Communications & HR | |

## Review of Goals

| 11/29/2006 | Final |
|---|---|

## Summary

How do you feel the employee performed this year? What were the greatest challenges and achievements?

| Development Objectives | Action Plan | Evaluation |
|---|---|---|
| | | |
| | | |

**Additional Accomplishments**

**Development Summary**

Personnel Summary

**Actual Training Days**

| | | |
|---|---|---|
| 0 | | 0 |
| 0 | | 0 |
| 0 | | 0 |

**Overall Performance Rating for Review Period ()**

Overall Performance Rating: Successful contributor

Comments:

excellent command of recruitment process and know how to manage people's expectations
takes on new initiatives, such as performance manager and graduates@swissre, quick learner, able to structure and implement in a timely fashion
strong analytical skills, understanding of complex comp issues related to hiring and maintaining staff
develop a consultative approach in terms of managing clients and their expectations
work closely with manager to identify a new and viable structure for HR
continue to be an active member of the Global HRIS project

**Summary**

**Employee**

James Nolley sign-off given - 03/05/2007 05:29:36 PM

**1st Level Manager**

Raymond Barbieri sign-off given - 03/05/2007 06:36:25 PM

| Goal Description* | Measurement Criteria | Evaluation* | Evaluation comments * |
|---|---|---|---|
| Successfully manage recruitment efforts for all exempt and nonexempt personnel, students, and temporary employees; Develop and implement a career pathing program and provide employee relations counseling to line and senior managers | Launch of automated recruitment tool; Successful implementation of graduates@swissre program; robust job description library; effective resolution of employee issues. | Partially exceeded | James has been instrumental in helping CMA HR reach goals in relation to the parent company's needs. James did jump into the graduates@swissre program and brought a level of professionalism to effort. James ensured that the "care and feeding" of the graduates has been established and has been both a resource and guide for the other recruiters in SRA. In the future I recommend that James approaches these type of external programs with less of an emotional reaction. James and I had a talk and I believe he understands that to be most effective that he should try and persuade people as to what the issues are and not react. As for his ability to jump in on employee issues...he needs to put himself in the place of the employee and ensure that all the necessary constructive measures have been taken. |
| Provide leadership and consulting support to lmanagement/senior management on matters of goals setting and development in support of performance management and company objectives | A clearly articulated, globally coordinated performance management process. A high level of employee participation and completeness. | Fully exceeded | James has worked effectively to help launch the new Performance Manager program. James has made it a priority to make sure that the program goals were being met and to make himself available to staff who needed help. Also developed a working relationship with Catherine Cloake in London. |
| Insure the effectiveness of existing compensation policies, guidelines and procedures; recommend revisions as well as naw awareness/ich are cost effective and consistent with compensation trends and Company objectives; Provide guidance to staff regarding compensation issues. | Timely and specific market data gathered in real-time from recruitment vendors and various other sources that leads to increased awareness and understanding of current and future hiring and compensation trends by hiring managers and management. | Fully achieved | Professional, experienced and possesses an in depth understanding of the labor market we compete in and the requirements for jobs. Does stay on top of comp and skill trends and recommends if we should move salary ranges and/or increase or decrease the skill sets of a job. |
| Recommend new approaches, policies, and procedures to effect continual improvements in efficiency of department and services performed | Increased "global" process awareness and intra-HR coordination of program and policy implementation. Accurate and timely reporting of HR metrics, headcount, etc. | Fully exceeded | Creative. Can ferret out improvements in traditional processes, as well as new programs. James' intelligence helps him to problem solve quickly and to work towards a resolution. |



C

Date:        August 16, 2007

To:          James Nolley

From:        Gordon Cook

Cc:          Human Resources
             Personnel File

Re:          45 Day Performance Improvement Plan

Customer service and the ability to interact positively with others is a critical component for employees in Human Resources.    After receiving a significant amount of both solicited and unsolicited feedback indicating unacceptable levels of customer service and some inappropriate interactions, you are being placed on formal warning and a 45-day performance improvement plan effective today.

The Recruiting function within Capital Management and Advisory is very important to the future of the business.  HR needs to continually search for talent and must be the proactive driver of the process. HR also needs to work as effectively and collegially as possible with internal employees and search firms.  You have not exhibited the effectiveness and collegial nature that is expected of your position. I have provided you with some of the performance issues as well as the Company's expectations with respect to improving those deficiencies:

- <u>Third Party Relationships</u>: We have received complaints from Korn/Ferry, ExecuSearch and Principal Search regarding interactions.   The common theme has been a lack of responsiveness on your part and a continual breakdown in dialogue and flow regarding searches.   Feedback has indicated that you hinder the recruiting process rather than enable it.  Your overall demeanor has been described as aggressive and defensive.  The firms feel you are setting up an "us versus them" environment and they find it difficult to deal with you directly.  Unfortunately, this means they have started going around you, as evidenced by status calls in which you do not participate or emails where you are not copied.

- <u>Recruiting Process</u>: You have continually mentioned the challenges of recruiting based on flaws in the process and the framework.  However, you have not taken on the challenge to document a process, create flowcharts, and recommend changes to improve the current process.  You have been in your position long enough, and your position level is advanced enough that a lack of framework and process should be viewed as a challenge to overcome as opposed to a stumbling block.

- Sense of Commitment/Ownership: There is not a strong sense that you feel committed to the recruiting process and the vacant positions that are actively being sourced. The search firms feel like you are disengaged and don't care about the positions they are sourcing. The same is true for Hiring Managers that have taken on searches themselves. You've made it clear on several occasions that you know little or nothing about a particular search because either a search firm or an individual Hiring Manager is handling it. However, they are all Swiss Re positions and HR should be fully aware of the status of all open requisitions and the corresponding candidates.

- Communication with Hiring Managers: Hiring Managers feel they are being neglected or ignored when it comes to your recruitment support. The common theme has been a lack of responsiveness with returning phone calls and emails, and a lack of coordination with the individual departments and hiring managers. Unfortunately, your overall lack of communication has led departments to move forward with the process on their own and has caused HR to lose control of the process and knowledge of the searches.

- Knowledge of the State of Recruiting: While the Sonic database may be helpful and you are tracking information using that medium, your overall knowledge of the state of recruiting is not at an acceptable level. We have reviewed the Global Recruitment Roadmap on several occasions and you have never had a full understanding of the vacancies within the New York office. You have not made any attempts to modify the spreadsheet in such a way that we can tell exactly which positions are approved, open, closed, active, on hold, or where we are in the process for each requisition.

- Problem Solving: Your problem solving abilities need to be challenged and improved. When we have discussed certain challenges within the organization, you have been quick to state that things can't be done based on a lack of structure and framework. However, there may be more creative ways to approach problems and come up with solutions. For example, when we tried to determine which search firms we have used in the past two years you indicated we have no way of knowing who they are and how often we've used them. There was no attempt on your part to determine if documents existed showing the frequency of use, or even simpler, if the Accounts Payable department could determine which search firms were used based on who has been paid and what the corresponding amounts were.

Based on the above issues and in an effort to help you improve your performance, I will be working closely with you to assist you in understanding and performing your job more effectively. I will also be providing you with feedback regarding your performance in regularly scheduled meetings with another representative from Human Resources.

During the next 45 days, we need to see significant improvement in the areas mentioned and I will monitor your performance regularly for improvement, as described above. If your performance does not improve significantly within that time or if you do not begin to make noticeable improvements during that time, you may be subject to further disciplinary action, up to and including termination of employment. If your performance improves to an acceptable level, you will be expected to maintain that level of performance or risk further disciplinary action, up to and including termination of employment for poor performance.