UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------- X
                                        :
JAMES NOLLEY,                           :       10 Civ. 7626 (DLC)
                        Plaintiff,      :
                                        :       OPINION & ORDER
           -v-                          :
                                        :
SWISS REINSURANCE AMERICA CORPORATION,  :
                                        :
                        Defendant.      :
                                        :
--------------------------------------- X

APPEARANCES:

For the Plaintiff:

James Nolley, pro se
1441 Seminole Road
North Brunswick, NJ 08902

For the Defendant:

Christopher H. Lowe
Brian D. Murphy
Seyfarth Shaw LLP
620 Eighth Avenue
New York, NY 10018-1405


DENISE COTE, District Judge:

    Plaintiff pro se James Nolley ("Nolley") brings this

lawsuit alleging employment discrimination pursuant to Title VII

of the Civil Rights Act of 1964, 42 U.S.C. § 2000-e et seq.

("Title VII"), and New York State and New York City human rights

laws against defendant Swiss Re America Holding Corporation

("Swiss Re").  Nolley alleges that he was discriminated against

on the basis of race and that Swiss Re retaliated against him
for a complaint of discrimination.  Following the completion of
discovery, Swiss Re has moved for summary judgment on all
claims.  For the following reasons, Swiss Re's motion is
granted.

Background

     The following facts are undisputed or taken in the light
most favorable to Nolley, unless otherwise noted.  Swiss Re is a
major international reinsurer with numerous lines of business
including, at all relevant times, a Capital Management and
Advisory Division ("CMA").  CMA's human resources personnel
operated primarily out of two offices:  London and New York.

I.  Nolley's Employment Prior to April 2007

     In April 2005, Nolley was retained as an independent
contractor by CMA's New York office to assist in recruiting.
Nolley had fifteen years of professional experience in the human
resources field, primarily in the financial services sector.
Within approximately one month, Nolley received an offer from
J.P. Morgan Chase, at which he had previously worked as a
contractor, to return as a permanent employee.  As a result,
Swiss Re extended an offer of permanent employment to Nolley,

which Nolley accepted.  On May 23, 2005, Nolley joined CMA's New York human resources department as a Vice President.

From May 2005 to April 2007, Nolley reported directly to Raymond Barbieri ("Barbieri"), Director of Human Resources for CMA-New York.  The Director of Human Resources in CMA's London office was Joanna Bardsley ("Bardsley").  Bardsley had interviewed Nolley in connection with his offer of permanent employment.  Both Barbieri and Bardsley reported to Don Stellwagen ("Stellwagen"), the New York-based Director of Human Resources for Swiss Re's Financial Services Division.

Nolley's primary responsibility for CMA was recruiting. His position required him to coordinate both with hiring managers in CMA's various divisions (e.g., Operations, Sales, Legal) to ensure hiring goals were met, and with outsider vendors (i.e., headhunting firms) on contract to conduct executive searches.  Nolley received generally positive performance reviews from Barbieri in 2005 and 2006.  The 2005 performance review described Nolley as "a highly productive individual" and "a strong team player."  It noted, however, that Nolley "needs to recognize that not everyone is as quick as he is."  Similarly, Nolley's 2006 performance review stated that he had "been instrumental in helping CMA HR reach goals in relation to the parent company's needs," and described Nolley as

3

"[p]rofessional, experienced, and possess[ing] an in depth understanding of the labor market" in which CMA competes.  But Barbieri also advised:  "In the future I recommend that [Nolley] approach[] these type [sic] of external problems with less of an emotional reaction."

In November 2006, Nolley had a confrontation with Cynthia Jon ("Jon"), a Senior Payroll Accountant in CMA, that prompted Jon to complain to a fellow employee, Michael Santangelo ("Santangelo"), who relayed her complaint to David Assenza ("Assenza"), a CMA Human Resources Manager.  According to Assenza's notes of a subsequent conversation with Jon, Jon stated that "this was not the first time [Nolley] chastised her and that there were other occasions where he was very intimidating to her."  Jon also told Assenza that Nolley had "been vocal about playing the 'race card' if need be."  There is no record of further action in connection with Jon's November 2006 complaint about Nolley.

On April 1, 2007, Santangelo himself had a confrontation with Nolley over a recruitment issue that led Santangelo to e-mail Barbieri, Nolley's direct superior.  In his e-mail to Barbieri, Santangelo described Nolley's tone as "aggressive[] (with expletives)".  According to Nolley, the tone of the

conversation was "regular discourse," although Nolley concedes that "it's possible" he might have cursed at Santangelo.

II.  Bardsley Becomes Nolley's Direct Superior.

Between May 2005 and April 2007, Nolley reported directly to Barbieri in New York, while Bardsley supervised human resources functions for CMA's London office.  At his deposition, Nolley described his relationship with Bardsley during this period as "professional".  For her part, Bardsley had privately expressed concern on at least one occasion to Phil Lotz ("Lotz"), CMA's CEO, about Nolley's interactions with colleagues.  In a January 2007 e-mail to Lotz, Bardsley described a telephone conference during which Jon's efforts to obtain information from Nolley were "met with hostility[.]" According to Bardsley, "[a] number of us . . . felt extremely uncomfortable with [Nolley's] style and approach[.]"  Bardsley indicated to Lotz that she had shared her observation that Nolley's conduct was "unacceptable" with Barbieri. Nevertheless, Bardsley arranged in late February 2007 for Nolley to visit CMA's London office, indicating in an e-mail to Lotz that she felt "it is important for [Nolley] to see beyond the US and to get a broader focus and understanding of the issues and structure of our London office in the hope that this will

5

strengthen relations between the two departments[,] and meet the rest of our team." At his deposition, Nolley stated that he did visit the London office at Bardsley's behest. According to Nolley, however, he went to London to help implement a recruiting software program, only to learn upon arrival from Bardsley that the implementation would not go ahead as scheduled. Nolley stated that he called Barbieri and asked to return to New York because he believed his time in London would not be productive.

At his deposition, Nolley spoke in general terms about "disjointedness . . . of the HR function between New York and London," stemming in part from parallel operations in both locations. Nolley also testified about differences that he encountered with Bardsley on CMA's diversity hiring policies. According to Nolley, at some point prior to April 2007, he had "a manager who was looking to fill out or to ensure that he didn't run afoul of some diversity issue within the firm" in connection a minority applicant for an open position. Nolley and Bardsley discussed "that issue . . . about hiring an African-American, versus a non-African-American." Nolley testified that Bardsley's perspective was, in essence: "We're all English, and so I don't quite understand . . . sort of how or why that's so important in the United States." At his

6

deposition, Nolley stated that he had found Bardsley's response to be "amazing," and that it had suggested to him evidence of a discriminatory bias.

Barbieri left Swiss Re in late April 2007.  As a result, Bardsley was promoted to Head of Human Resources for CMA-Global and assumed responsibility for both New York and London CMA human resources functions.  Bardsley thereby became Nolley's direct supervisor despite the fact that Bardsley worked out of CMA's London office.

Shortly before Barbieri's departure and Bardsley's promotion were announced, Bardsley received an e-mail from Barbieri about Nolley.  The e-mail, dated April 18, 2007, reads:

> When you are here we will need to talk about James.  I
> have been doing some digging and apparently, the
> perception is not good.  Sad to say that James
> probably brought me down.  I wish things turned out
> differently, like we getting rid of James and putting
> me in the recruitment spot.  Anyhow, I don't think you
> can move along with him.  I have a resume of a really
> great contractor you may want to consider.

At his deposition, Nolley stated that he had no basis for believing that Barbieri ever made a decision with respect to Nolley's employment that was the product of discriminatory intent.

III.  FS Vision and "Sea Changes" at Swiss Re

Bardsley's promotion roughly coincided with the beginning of a major Swiss Re initiative to restructure its financial service offerings.  The initiative, referred to as "FS Vision" within Swiss Re, promised significant change in numerous Swiss Re divisions, including human resources.  Nolley testified at his deposition that FS Vision augured "sea changes," and that "[t]here was a huge recruitment effort that was . . . going on that probably needed looking after."

Soon after Bardsley's promotion, in early May 2007, Nolley contacted Bardsley to discuss his own role at CMA. Specifically, Nolley sought to "return to more of a generalist role"; in other words, to focus less on recruiting in particular and take on more responsibility in relation to other human resources functions, such as "employee relations . . . training, development."  Bardsley solicited further input from Nolley, and Nolley e-mailed Bardsley with a description of the "Generalist" responsibilities he hoped to take on.  Bardsley thanked Nolley for his input, and told him that she would take his suggestions under consideration.

The exchange between Nolley and Bardsley over Nolley's role at CMA became more confrontational over the ensuing weeks. According to Nolley, Bardsley did not "share [her] thought

8

process" on the issue with Nolley, and he became concerned that she was "brushing it off."  On May 22, Bardsley stated in an e-mail to Nolley, "[A]s I have said a number of times I am very conscious of your desire . . . to move away from recruitment and focus on the areas of interest that you listed and I continue to recognize this as we pull our thoughts together."  Bardsley also wrote:  "I am happy to try to answer any immediate questions you have but need you to be patient and bear in mind that I don't have all the answers yet."  That same day, Bardsley sent an e-mail to Lotz, Stellwagen, and Bob Ratcliffe ("Ratcliffe"), CMA's London-based manager for information technology, detailing what Bardsley described as a hostile telephone conversation with Nolley.  The subject of the telephone conversation was Nolley's uncertainty about his role at CMA.  In her e-mail, Bardsley stated that Nolley was "undeniably aggressive, confrontational, and rude," and that he "frankly shocked [her] with his outburst."  Bardsley also indicated that she had raised her own voice and warned Nolley that she "was not prepared to listen to him being so aggressive and abusive."  According to Nolley, the telephone conversation discussed in the e-mail occurred, but he denies adopting an "aggressive" tone.

IV.  Hiring of Gordon Cook as New York-Based Manager

In late June 2007, Catherine Cloake ("Cloake"), an assistant to Bardsley and member of CMA human resources' administrative support staff in London, had a confrontation with Nolley while visiting CMA's New York office.  In a June 20 e-mail to Bardsley, Cloake described a disagreement with Nolley that resulted in Nolley "ranting at [Cloake] in a [sic] aggressive manner" within earshot of employees in different departments.  According to Nolley, the disagreement arose because Cloake had asked Nolley to complete aspects of a project that were Cloake's responsibility.  Nolley denies yelling at Cloake.

According to Bardsley, Cloake's June 20 e-mail prompted Bardsley to reconsider her decision to manage human resources in both London and New York on her own.  She initiated a conversation with Stellwagen about hiring a manager to replace Barbieri in New York.  Stellwagen concurred after reading Cloake's June 20 e-mail, stating in a June 21 e-mail to Bardsley that "we must seriously consider the need for leadership here . . . .  Given James's style, someone has to be in place who's strong enough to keep him in check, or, alternatively, we decide he should move on."

Bardsley then contacted Gordon Cook ("Cook"), the contractor to whom Barbieri had referred in his April 18 e-mail, about joining CMA in the temporary position of Interim Head of CMA – New York Human Resources.  The position would report directly to Bardsley, and would oversee the work of CMA's New York-based human resources employees, including Nolley.  CMA neither posted the position's availability nor informed current employees, including Nolley, of its existence.  When contacted by Bardsley, Cook had approximately 20 years of experience in the human resources field, including several stints in human resources management.  In a June 28 e-mail to Lotz, Bardsley stated: "I would like Gordon to be my 'point person' in NY.  I would like to take him on a contract basis until the end of the year . . . .  As you know he has very relevant experience that I feel would be of extreme value to the FS Vision project."  In the same e-mail and referring to Nolley, Bardsley stated:

> In the spirit of complete transparency I am anticipating a negative reaction from James on this as I am sure he will feel that he is able to take on this role[.]  [H]owever my experience to date has not given me a positive impression of his ability to be a true team player; he appears to be resentful of the changes I have made and the structure we are building[.]  [H]owever I will continue to work on this.

In early July, Bardsley informed Nolley that she had decided to hire Cook as the interim manager in charge of human resources operations and personnel in CMA's New York office.

According to Nolley, he told Bardsley that he wished he had known about the position and had an opportunity to apply; Bardsley indicated that the Cook hire was only an interim decision, and that no firm decisions had been made about long-term positions and responsibilities.  In a July 6 e-mail to Lotz and Stellwagen, Bardsley described Nolley's reaction to the news as "extremely disappointing."  According to Bardsley's e-mail, Nolley expressed disappointment that he had not been told about the Cook hire earlier, and annoyance that he would be reporting to a contract employee.  Stellwagen responded to Bardsley's e-mail by indicating that, "James has an important job as recruiting will only intensify. . . .  As Gordon is in a temp role, James has the opportunity to fill that role. . . .  He should do his job and accept the decision we made.  If he chooses not to he is effectively resigning."  Stellwagen also suggested that he and Bardsley contact Erika Ozer ("Ozer"), a member of Swiss Re's legal department, about Nolley's reaction to the Cook hire.  Stellwagen guessed that Ozer "would suggest that we give [Nolley] a memo defining his role and our expectations."

V.   July 2007: Repeated Nolley-Bardsley Confrontations

     Over the next several days, members of the CMA human
resources team dealt with a situation in which a job candidate
to whom an offer had been extended had subsequently been charged
with a misdemeanor.  Over the course of an exchange of several
e-mails, Bardsley repeatedly asked Nolley for more details about
the nature of the charges.  Nolley provided the details.  On
July 9, Nolley forwarded the exchange to Stellwagen and asked to
speak with him.  According to Nolley, "Having been nothing but
supportive I am met consistently with this sort of response.
When I ask for clarification, I am only told there are no
answers, opinions or thoughts that can be shared.  Although I
realize this is a stressful time, I do require some level of
clarity on how I can participate in building this new
organization."

     Also on July 9, Bardsley e-mailed Nolley a document
entitled "James Nolley: Clarification of Role and
Responsibilities/2007 Goals."  The document included a bullet-
point list of responsibilities associated with Nolley's
position, most focusing on recruitment.  In her e-mail to
Nolley, Bardsley described the list as being built "around both
your job as I see it today as well as factoring in where
applicable the issues you highlighted as areas of interest when

13

you wrote to me in May." After Bardsley sent Nolley the
document, the two spoke over the telephone. At his deposition,
Nolley was asked about the document and subsequent conversation
with Bardsley and responded, "Was I fine with this [document]?
Yes, it as [sic] represents those responsibilities as accompany
a recruiter." In a July 9 e-mail to Stellwagen, Lotz, and
Ratcliffe, Bardsley stated that during the conversation, Nolley
was "hostile and monosyllabic," and criticized her leadership
style. Stellwagen responded:  "I will not accept his hostile
behavior toward you and he needs to know that such behavior will
result in his termination."

On or around July 11, Nolley and Stellwagen had a one-on-
one meeting. Nolley claims that during this conversation he
told Stellwagen that he believed Bardsley was both "hostile" and
"racially biased." In an e-mail to Bardsley sent on July 11,
Stellwagen characterized his conversation with Nolley as
"pleasant and . . . direct." According to Stellwagen, he and
Nolley discussed Nolley's concern that Nolley was out of the
loop on issues pertaining to FS Vision. Stellwagen stated that
he told Nolley that Nolley "must accept that there will be
[meetings] where's [sic] he's excluded and other times he's in
and others aren't." Stellwagen also told Bardsley that Nolley's
role at CMA had been discussed, and Stellwagen suggested that

14

he, Bardsley, and Nolley meet to discuss Nolley's role and "clear the air". Finally, Stellwagen stated that he and Nolley discussed the importance of Nolley working hard to support the contractors CMA had recently brought on (presumably including Cook), and how Nolley could demonstrate that he was "capable of replacing either of them." When Bardsley asked whether she needed to be specifically aware of any other comments Nolley had made about her, Stellwagen responded that "[t]here was no Joanna bashing." Stellwagen mentioned that Nolley had brought up the exchange over the candidate's misdemeanor charge and Nolley's "desire to feel more a part of the team." According to Stellwagen's e-mail, "[b]oth topics took less than a minute." Bardsley forwarded the exchange to Lotz and Ratcliffe.

With Cook joining CMA's New York office, a new dispute arose concerning office space. During his first two years of employment in CMA, Nolley had worked at a table (later converted to a cubicle); Barbieri had occupied an office. After Barbieri's departure, Nolley and another CMA human resources employee, Margaret Pitcher ("Pitcher"), had occasionally used the vacant office to make telephone calls. On July 13, Bardsley e-mailed Nolley and Pitcher to inform them that Cook would be given an office then occupied by another manager, and that manager would move into Barbieri's old office; in the interim,

Cook would occupy Barbieri's old office.  Nolley responded:
"Given our initial conversations, this does not work for me."
According to Nolley, he "wasn't upset about [Bardsley] putting
[Cook] into Mr. Barbieri's office."  But, he was concerned that
without access to an office, "as I sit at a table across a
trading-floor type environment and speak of folks' or employees'
confidential information . . .  I literally had to sit with my
head on my table and talk towards the floor so that people
wouldn't hear the discrete details[.]"  He and Bardsley then
spoke about the decision to place Cook in an office.  According
to a July 13 e-mail Bardsley sent to Stellwagen, Lotz, and
Ratcliffe, the conversation was "deeply unpleasant."  Bardsley
stated that Nolley "raise[d] his voice and talk[ed] to me in an
extremely hostile aggressive way[.]"  During the conversation,
Nolley criticized the decision to assign Cook the office as well
as the role description Bardsley had provided to him and voiced
his belief that he lacked "clear operating parameters."

VI.  Issuance of Performance Improvement Plan

On August 16, Nolley was issued a 45-Day Performance
Improvement Plan ("PIP").[1]  At his deposition, Nolley stated that

---

[1] On August 2, Bardsley indicated in an e-mail to Lotz and
Ratcliffe that the PIP would be issued.  The e-mail stated that
Cook had "observe[d] some of the frustrations of both the

he received the PIP during a meeting with Cook and Stellwagen in
Stellwagen's office.  The PIP was prepared by Bardsley and Cook.
Its introduction states that its issuance was prompted by "a
significant amount of both solicited and unsolicited feedback
indicating unacceptable levels of customer service and some
inappropriate interactions[.]"  The PIP contained a number of
detailed criticisms, including of Nolley's "sense of
commitment/ownership," his knowledge of the state of
recruiting," and his "problem solving."  It used particularly
strong language in connection with Nolley's relationships with
partner search firms and with hiring managers in other CMA
departments.  According to the PIP, CMA management had received
complaints from partner search firms indicating "a lack of
responsiveness on your part and a continual breakdown in
dialogue and flow regarding searches."  Further, the PIP stated:

> Your overall demeanor has been described as aggressive
> and defensive.  The firms feel you are setting up an
> 'us versus them' environment and they find it
> difficult to deal with your directly.  Unfortunately,
> this means they have started going around you, as

business and the search firms that try to work with [Nolley]."
Additionally, Bardsley stated:  "As we continue to look at the
role that [Nolley] plays it is becoming more and more apparent
that he is not as busy as he would like us to believe and his
productivity does not match the management time he is currently
taking."

evidenced by status calls in which you do not
participate or emails where you are not copied.[2]

The PIP also noted that hiring managers within CMA departments
"feel they are being neglected or ignored when it comes to your
recruitment support."  The PIP concluded by stating that failure
to improve in the areas listed during the ensuing 45-day period
could lead to "further disciplinary action, up to and including
termination of employment."  At his deposition, Nolley
characterized many of the statements in the PIP as unfair,
particularly those relating to his demeanor and his relationship
with partner search firms, but acknowledged that some CMA hiring
managers might have felt neglected or ignored.  Nolley
attributed this to the sheer number of vendors and hiring
managers with whom he had to interact on a daily basis.

In either late August or early September, Nolley and
Bardsley had a heated telephone conversation in which Nolley
asked Bardsley repeatedly about his role in CMA and about the
direction Bardsley was taking CMA's human resources department.
At some point in the conversation, Bardsley stated "I don't
understand you people."  Nolley asked what Bardsley meant by

---

[2] The record includes a July 19 e-mail from Richard Stein
("Stein"), an executive at recruiting vendor Korn Ferry, to
Bardsley in which Stein writes: "[T]he team here are very
concerned about James.  I think they are nervous about telling
you . . . ."

"you people," and Bardsley responded that she meant people in
New York.  There is no record of Nolley reporting this
conversation to Stellwagen or any other supervisor at Swiss Re.

VII.  Termination of Nolley's Employment

On October 3, Nolley and Cook took part in a conference
call with Donna Nevins ("Nevins"), an employee of the recruiting
firm FutureStep (which was part of Korn Ferry).  CMA used
FutureStep to recruit and hire candidates experienced in the use
of trading platform software CMA hoped to implement as part of
its broader FS Vision restructuring.  Nolley had a significant
role in this recruitment initiative, and Nevins was one of his
chief points of contact at FutureStep.  Significant tension
between CMA and FutureStep had preceded the call.  On September
18, for example, in an e-mail to Nolley and others, Bardsley
stated that "[Korn Ferry/FutureStep's] candidate flow as well as
more importantly their quality of Operations candidates have
fallen short of our expectations[.]  This is now frustrating
beyond belief and not a situation we are prepared to continue
with."  According to Nolley, he placed the October 3 call to
Nevins at the behest of Cook, because Nevins had not been
responsive to recent communications from Nolley.

At his deposition, Nolley testified that he asked Nevins for an update, and Nevins responded that she had been trying to "keep [Nolley] in the loop."  Nolley responded:  "Donna, you haven't sent me an e-mail literally in two weeks.  I don't understand how 'trying to keep in touch' with me . . . means that I haven't heard from you in two weeks."  Nolley testified that he found the exchange "funny", and that while he raised his voice in responding to Nevins, he did not yell at her.  At that point, Nevins "became offended", paused the call, and returned with George Puig ("Puig"), a FutureStep executive, on the line.

Cook's October 3 notes of the call and its aftermath state that Nolley "started off the call in an incredibly confrontational way" and then throughout the conversation "would talk over [Nevins], interrupt her, and talk down to her."  Cook noted that he "barely commented," but that "[e]very time I tried to be 'peacemaker,' James would launch another verbal attack."

Cook's notes state that after the call he admonished Nolley:  "I told [Nolley] I thought his approach was completely unprofessional and unnecessary.  We have been trying to patch up relations with FutureStep and the call definitely set us back."  According to the notes, Cook told Nolley that Nolley's conduct was precisely the opposite of what was in Nolley's PIP.  The

20

notes also indicate that Nolley told Cook that his "style is forceful and aggressive and . . . gets results."

At his deposition, Nolley stated that he did discuss the call with Cook immediately after it ended.  According to Nolley, Cook stated:  "Well, James, that did not go well . . . .  You could have handled that better."  Nolley responded that he did not believe he could have handled it better, that the call had been Cook's idea, and that Nolley would have been "perfectly happy" to go on with his day without the call.  Nolley denied telling Cook that his style was "forceful and aggressive" on that occasion, but stated that he had described his style in those terms to Cook before.

On October 4, Bardsley e-mailed Lotz and Stellwagen and recommended that Nolley's employment be terminated.  In her e-mail, Bardsley stated:  "The behavior James demonstrated during this call and his aggressive demean[or] are both traits which Gordon has been talking to James about and coaching him on how to conduct himself."  Bardsley then cited the call as proof that the PIP had not been effective at changing Nolley's conduct, and indicated that she feared Nolley would continue to consume significant management time.

On October 5, Swiss Re terminated Nolley's employment.  The news was delivered by Stellwagen and Cook in a meeting in Stellwagen's office.

Discussion

Summary judgment may not be granted unless all of the submissions taken together "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination, the court must view all facts "in the light most favorable" to the nonmoving party.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); see also Holcomb v. Iona Coll., 521 F.3d 130, 132 (2d Cir. 2008).

Once the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must "set out specific facts showing a genuine issue for trial," and cannot "rely merely on allegations or denials" contained in the pleadings.  Fed. R. Civ. P. 56(e); see also Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009).  "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," as "[m]ere conclusory

allegations or denials cannot by themselves create a genuine
issue of material fact where none would otherwise exist." Hicks
v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted).
Only disputes over material facts -- "facts that might affect
the outcome of the suit under the governing law" -- will
properly preclude the entry of summary judgment. Anderson v.
Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also
Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475
U.S. 574, 586 (1986) (stating that the nonmoving party "must do
more than simply show that there is some metaphysical doubt as
to the material facts").

In cases involving allegations of employment
discrimination, the court must exercise "an extra measure of
caution" in determining whether to grant summary judgment
"because direct evidence of discriminatory intent is rare and
such intent often must be inferred from circumstantial
evidence." Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597,
603 (2d Cir. 2006) (citation omitted); see also Holcomb, 521
F.3d at 137.  Even in an employment discrimination case,
however, "a plaintiff must provide more than conclusory
allegations to resist a motion for summary judgment." Holcomb,
521 F.3d at 137.  The ultimate test for summary judgment in
discrimination cases, as in other cases, "is whether the

evidence can reasonably support a verdict in plaintiff's favor." James v. N.Y. Racing Ass'n, 233 F.3d 149, 157 (2d Cir. 2000).

Finally, in considering the defendants' summary judgment motion, the court liberally construes all submissions by the pro se plaintiff and "interpret[s] [them] to raise the strongest arguments that they suggest." Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 474 (2d Cir. 2006) (per curiam) (citation and emphasis omitted).  The application of this forgiving standard for pro se litigants, however, "does not relieve plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment."  Jorgensen v. Epic/Sony Records, 351 F.3d 46, 50 (2d Cir. 2003) (citation omitted).

I.  Nolley's Title VII Claims are Untimely.

As a preliminary matter, Swiss Re argues that Nolley's Title VII claims must be dismissed as untimely.  "In order to be timely, a claim under Title VII . . . must be filed within 90 days of the claimant's receipt of a right-to-sue letter." Sherlock v. Montefiore Medical Ctr., 84 F.3d 522, 525 (2d Cir. 1996); 42 U.S.C. § 2000e-5(f)(1).  The EEOC's right-to-sue letter is dated February 11, 2010; Nolley asserts that he received it on February 15, 2010.  Nolley filed his complaint against Swiss Re on October 5, 2010, more than 90 days after he

acknowledges receipt of the right-to-sue letter.  Nolley's Title VII claims are therefore untimely and must be dismissed.


II.  Nolley's Discrimination Claims

     Nolley brings claims of employment discrimination under the NYSHRL (New York Executive Law § 296 et seq.); and the New York City Human Rights Law (N.Y.C. Admin Code § 8-101 et seq.) ("NYCHRL").  The same substantive standards apply to claims of employment discrimination under Title VII and the NYSHRL. Vivenzio v. City of Syracuse, 611 F.3d 98, 106 (2d Cir. 2010). Claims brought under the NYCHRL are analyzed using the same framework as Title VII claims, Leibowitz v. Cornell Univ., 584 F.3d 487, 498 & n.1 (2d Cir. 2009), but "must be reviewed independently from and more liberally than their federal and state counterparts."  Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 278 (2d Cir. 2009) (citation omitted).  Thus, this Opinion will draw on the legal standards from Title VII jurisprudence.

     Claims of employment discrimination brought under Title VII are analyzed using the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973). To establish a prima facie case of discrimination under Title VII, a plaintiff must demonstrate that: "(1) he is a member of a

protected class; (2) he was qualified for the position he held;
(3) he suffered an adverse employment action; and (4) the
adverse action took place under circumstances giving rise to the
inference of discrimination." Ruiz v. County of Rockland, 609
F.3d 486, 492 (2d Cir. 2010).

> [A]n inference of discriminatory intent may be derived
> from a variety of circumstances, including, but not
> limited to  . . . the employer's criticism of the
> plaintiff's performance in ethnically degrading terms;
> or its invidious comments about others in the
> employee's protected group; or the more favorable
> treatment of employees not in the protected group; or
> the sequence of events leading to the [adverse
> action].

Leibowitz, 584 F.3d at 502 (citation omitted).  A plaintiff's
burden in presenting evidence to support a prima facie case is
"de minimis."  Sassaman v. Gamache, 566 F.3d 307, 312 (2d Cir.
2009) (citation omitted).

If the plaintiff satisfies this initial burden, "a
presumption of discrimination arises, and the burden shifts to
the defendant, who must proffer some legitimate
nondiscriminatory reason for the adverse action." Spiegel v.
Schulmann, 604 F.3d 72, 80 (2d Cir. 2010).  If the defendants
can offer such a reason, the presumption of discrimination
dissolves, and "the defendant will be entitled to summary
judgment unless the plaintiff can point to evidence that
reasonably supports a finding of prohibited discrimination."

Id. (citation omitted).  The plaintiff may do so by showing that the defendant's reasons were pretextual or that the defendant's reasons "were not the only reasons and that the prohibited factor was at least one of the 'motivating factors.'"  Holcomb, 521 F.3d at 138 (citation omitted).  Although the burden of producing evidence may shift between the parties under this framework, the "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  Leibowitz, 584 F.3d at 499 (citation omitted).

Nolley alleges that he was subjected to racial discrimination through (1) the failure to promote him to the position given Cook; (2) his exclusion from meetings and the assignment of "less important" work responsibilities; (3) the issuance of the PIP; and (4) the termination of his employment. Swiss Re does not argue that any one of these four actions fail to constitute adverse employment actions.  It is assumed, therefore, that Nolley has carried his de minimis burden of showing prima facie evidence of discrimination with respect to each of the four actions.  Swiss Re argues, however, that it had a legitimate business reason for its actions and that Nolley has failed to present sufficient evidence from which a jury could infer that it acted with discriminatory intent.

27

Each of the four adverse actions will be addressed in turn.
Because Nolley relies on Bardsley's use of "racially-charged"
language to show discriminatory intent in connection with each
of the four actions, however, the significance of Bardsley's
language will be addressed first.

A.  Bardsley's Use of "Aggressive" in Reference to Nolley

Nolley emphasizes that Bardsley referred to Nolley as
"aggressive".[3]  He contends that this term should be understood
as a reference to race and reflects Bardsley's racist attitude.
Nolley argues that "aggressive" is a racially-charged term used
to characterize African-American men as "intimidating and worthy
of being feared," and that it is "commonly viewed as racial
code."

Nolley has offered evidence that Bardsley used the term
aggressive when describing Nolley on four occasions.  In a May
2007 e-mail to Stellwagen and others, Bardsley complained that
Nolley had been "undeniably aggressive, confrontational, and

---

[3] In his complaint and at his deposition, Nolley refers to a
telephone call with Bardsley in late August or early September
2007 in which Bardsley used the phrase "you people,"
subsequently stating that she meant New Yorkers.  In his
opposition brief, Nolley does not mention the comment or argue
that it is probative of discriminatory intent on Bardsley's
part.  Swiss Re argues that Bardsley's one-time use of the
phrase "you people", quickly clarified to mean "New York"
people, is not evidence of discrimination.

28

rude" in a telephone conversation about Nolley's role at CMA. In a July 2007 e-mail to a similar group of recipients, Bardsley described Nolley speaking to her "in an extremely hostile aggressive way". The August 2007 PIP, which was prepared by Bardsley and Cook, explained that search firms had described Nolley's "overall demeanor" as "aggressive and defensive." Finally, in an e-mail recommending the termination of Nolley's employment in October 2007, Bardsley referred to Nolley's "aggressive demeanor" during the call with Nevins.

"The relevance of discrimination-related remarks does not depend on their offensiveness, but rather on their tendency to show that the decision-maker was motivated by assumptions or attitudes relating to the protected class." Tomassi v. Insignia Financial Group, Inc., 478 F.3d 111, 116 (2d Cir. 2007).

> In determining whether a remark is probative, [courts] consider[] four factors: (1) who made the remark (i.e., a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (i.e., whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (i.e., whether it was related to the decision-making process).

Henry v. Wyeth Pharmaceuticals, Inc., 616 F.3d 134, 149 (2d Cir. 2010).

Under this test, Bardsley's remarks describing Nolley as "aggressive" are not probative of discriminatory intent. It is

29

true that Bardsley was Nolley's supervisor during the relevant period and a decision-maker in connection with Nolley's employment, and referred to Nolley as aggressive in the PIP itself and immediately prior to the termination of Nolley's employment, in direct relation to these decisions.  While these factors weigh in favor of their probative value, the third factor weighs decisively against finding that Bardsley's "aggressive" remarks are probative of discriminatory intent.

To begin with, the word "aggressive" is an adjective that is frequently used in ordinary conversation with no racial overtones or implied reference.  Thus, its ability to denote bias depends entirely on its context.

Bardsley's May 2007 and July 2007 e-mails recount Bardsley's impression of conversations with Nolley and Nolley's tone and behavior during those conversations.  Each conversation was initiated by Nolley, and both concerned decisions by Bardsley to which Nolley vehemently objected.  Nolley does not deny that the exchanges recounted in the e-mails occurred.  In context, Bardsley's use of the word "aggressive" in these e-mails is insufficient to raise a question of fact as to whether Bardsley acted with discriminatory intent.

In the PIP, the word is used once in the course of describing the complaints the search firms had made of Nolley.

30

Nolley does not dispute that the search firms actually made each of the complaints recited in the PIP and that they used the term "aggressive" in those complaints.  Thus, there is no basis to find that the use of this adjective in the PIP reflects Bardsley's racial animus.

Bardsley's final use of the term "aggressive" to describe Nolley followed Cook's observation of Nolley during the October 3 telephone call, and Cook's detailed description of Nolley's behavior during the call in the notes he wrote that day.  Cook explained that Nolley had been confrontational, would talk over and interrupt Nevins and launch a verbal attack every time Cook tried to be a peacemaker.  When Cook told Nolley after the call that his conduct was unprofessional and unnecessary, Cook's notes reflect that Nolley replied that his style is "aggressive" and gets results.  Bardsley's subsequent e-mail to her superiors, relying upon Cook's description of the October 3 call, described Nolley's "aggressive" demeanor as an issue on which Swiss Re had been counseling Nolley.  Again, taken in context, Bardsley's repetition of the term "aggressive" does not raise a question of fact regarding Bardsley's discriminatory intent.

B.  Failure to Promote

Nolley alleges that Swiss Re discriminated against him when it hired Cook rather than promoting Nolley to Barbieri's former position.  Swiss Re has offered ample evidence of legitimate, nondiscriminatory reasons for not promoting Nolley.  When Bardsley made the decision to hire Cook, she did so because of management's concerns over Nolley's attitude and performance.

Nolley offers three reasons why Swiss Re's failure to appoint him to succeed Barbieri was discriminatory.  First, he points out that he was never notified that the position was available or given an opportunity to apply for it.  Swiss Re admits that it did not post the position or consider Nolley for the position.  These facts by themselves, however, are not indicative of racial discrimination.  "Personality conflicts at work that generate antipathy" and "snubbing by supervisors and co-workers" are, without any evidence of discrimination, simply not actionable under federal law.  Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) (citation omitted).

Nolley next argues that it is "questionable" whether Cook was more qualified than Nolley to replace Barbieri.  A "discrepancy" in qualifications between candidates may be probative of discrimination.  Byrnie v. Town of Cromwell, Bd. of Educ., 243 F.3d 93, 103-104 (2d Cir. 2001).  As Nolley's

32

argument implies, he does not suggest that he was more qualified than Cook.  While both Nolley and Cook had approximately 20 years' of experience in the human resources industry, Cook had strong management experience which Nolley did not possess.  Even more critically, Cook had the endorsement of Barbieri, who recommended that Cook be hired and Nolley's employment terminated.  Nolley has admitted that there is no basis to believe that Barbieri harbored any racial bias against him. Nolley has failed to offer evidence, therefore, from which a jury could infer based on a comparison of their qualifications that Swiss Re was motivated by discrimination when it hired Cook rather than promoting Nolley.

Finally, Nolley argues that Cook's status as an outside contractor is evidence of Swiss Re's discriminatory intent.  He reasons that Swiss Re hired an outside contractor to help Bardsley and other executives shield themselves when they fired Nolley.  Even if Swiss Re hoped that Cook could assist in terminating Nolley's employment, that fact provides no support for Nolley's discrimination claim unless Nolley has evidence that the decision to fire Nolley was itself motivated by racial discrimination.  That issue is discussed below.

In sum, Nolley has not shown that there is sufficient evidence in the record to create a material factual dispute over

whether Swiss Re's failure to promote him was discriminatory. Swiss Re is therefore entitled to summary judgment on Nolley's failure to promote claim.

C.  Meetings and Assignments

Nolley alleges that he suffered employment discrimination through his exclusion by Bardsley from important meetings and e-mail chains.  According to Nolley, he was excluded from the following meetings and e-mails:  (1) Swiss Re's 2007 offsite retreat for human resources personnel in Armonk, New York; (2) managerial meetings related to the recruitment project with FutureStep, and an e-mail chain discussing those meetings; and (3) meetings of CMA's Human Resources Committee ("HRC"), to which Tim Hodgson ("Hodgson"), a CMA human resources employee in London, went.

Nolley has not offered sufficient evidence about the Armonk retreat to raise any inference of discrimination.  He has variously alleged that it took place as early as April 2007 and as late as August 2007.  There is no evidence of who was responsible for formulating invitations to the retreat, who was invited to the retreat, and who actually attended the retreat. Nolley does not know whether the only other employee in CMA's New York human resources office was invited or attended.

34

Nolley alleges that he was improperly excluded from meetings that concerned CMA's recruiting contract with FutureStep.  The meetings were attended by Cook and Bardsley, who were senior, supervisory employees.  Nolley cannot and does not argue that he was similarly situated to them.[4]

Next, Nolley points to a document dated March 9, 2007, and apparently authored by Bardsley, to argue that Hodgson, a similarly situated Caucasian employee in CMA's London human resources office, was tapped by Bardsley to attend senior-level meetings while Nolley was not.  The document, entitled "Handover Notes", predates the time Nolley began reporting to Bardsley. In one section, it discusses Nolley's plans to visit the London office, and states that "we should try to get a few more agencies to meet James who possibly have a global reach[.]"  The document does not demonstrate that Bardsley sought to exclude Nolley from opportunities for advancement; if anything, it demonstrates the contrary.

Finally, Nolley alleges that he was given less important assignments than Caucasian employees.  To support this claim, he points to a May 2007 e-mail in which Bardsley, who had received

---

[4] Cloake was included on the e-mails regarding these meetings. Since Cloake performed administrative and support functions for Bardsley, her inclusion on an e-mail that included Bardsley is not evidence of discrimination against Nolley.

a list of "workstreams" from Stellwagen, asks Stellwagen whether "there [is] a particular reason for [Nolley] being mentioned on a workstream and not" one of Bardsley's London-based employees. This single e-mail does not show racial discrimination in workplace assignments.  Indeed, it shows only that Bardsley sought to add a London-based employee to an assignment, not that she sought to exclude Nolley from an assignment.

In sum, Nolley has not produced sufficient evidence to show that Swiss Re discriminated against him by excluding him from meetings and assignments.  Swiss Re is entitled to summary judgment on this claim.


D.  The August 16, 2007 PIP

Nolley alleges discrimination on the basis of the PIP issued on August 16, 2007.  The PIP outlined perceived deficiencies in Nolley's performance, and warned that failure to cure those deficiencies could result in the termination of his employment.  Nolley claims that Bardsley directed Cook to prepare the PIP as a step towards firing Nolley.

The first item discussed in the PIP is Nolley's antagonistic relationship with third-party search firms.  It cites complaints received from three search firms.

Complaints from the search firms with which Nolley was expected to coordinate constitute a legitimate, nondiscriminatory reason for issuing the PIP.  To carry his burden of showing that the PIP was issued because of discrimination, Nolly principally relies on his allegation that the PIP "is misleading and contains false statements".  Nolley does not deny, however, that the search firms had in fact complained about him.[5]  Nolley's conclusory attack on its reliability is insufficient to raise a question of fact regarding Swiss Re's motives in issuing the PIP.

Next, Nolley contends that "PIPs are used as a form of documentation to later justify questionable terminations."  Even if PIPs have been used on occasion to mask discrimination, Nolley must offer evidence that it was so used in this case.  Without raising a question of fact regarding the existence of complaints by search firms about him, he has not shown that this PIP was prompted by discrimination against him due to his race.

Nolley also argues that the August 2007 PIP is at odds with the performance evaluations he received in 2005 and 2006.  The existence of positive performance evaluations in prior years is

---

[5] At his deposition, Nolley testified that he did not know whether complaints about him were received from third parties. A draft of the PIP lists six individuals from the three search firms as the sources of the complaints against Nolley.

37

insufficient by itself to raise a question of fact without evidence that the PIP's description of third-party complaints was false or at least inaccurate.

Finally, Nolley argues that the PIP's claim that he "hinder[ed] the recruiting process rather than enable[d] it" is belied by the annotated list of partner search firms that he provided in February 2007 to human resources colleagues.  While this list demonstrates Nolley's knowledge of the firms, it does not raise a question of fact regarding the complaints that the PIP describes those firms making about Nolley.

In sum, Nolley has failed to present evidence that the PIP was issued due to discrimination against him.  Swiss Re is granted summary judgment on this claim as well.


E.  Termination of Nolley's Employment

Finally, Nolley argues that the termination of his employment with Swiss Re was discriminatory.  As before, even assuming that Nolley can demonstrate a prima facie discrimination claim, Swiss Re is entitled to summary judgment.

The events precipitating the termination of Nolley's employment occurred on October 3, 2007.  It is undisputed that Nolley and Cook called FutureStep's Nevins, that the discussion between Nolley and Nevins deteriorated into confrontation, that

Nevins summoned a FutureStep executive to join the call (because, in Nolley's words, Nevins "became offended"), and that Cook criticized Nolley's conduct immediately after the call ended.  The PIP explicitly listed Nolley's confrontational interactions with partner firms as a serious performance deficiency.  It also put Nolley on notice that a failure to improve during the 45-day period, or failure to "maintain [an acceptable] level of performance" could result in termination. Swiss Re therefore has produced evidence of a legitimate, nondiscriminatory reason for the termination.

Nolley does not contest that he had a confrontational call with Nevins.  Instead, he argues that the stated basis for the termination of his employment was pretextual because there were significant deficiencies in FutureStep's performance and Nevins lied during the call.

Any deceitful conduct by Nevins or deficiencies in FutureStep's performance do not create an issue of fact regarding Nolley's own performance during the telephone call or Swiss Re's motives in firing Nolley for his failure to perform as his employer expected and as outlined in the PIP.  As already noted, an employer is permitted to set its own performance standards so long as they are not discriminatory.  Nolley has therefore failed to show that there is evidence in the record

sufficient to support a finding that Swiss Re's decision to terminate his employment was motivated in whole or in part by discriminatory bias.

There is no support for a different outcome for any of the Nolley's discrimination claims brought pursuant to the NYCHRL. "Interpretations of New York state or federal statutes with similar wording may be used to aid in interpretation of New York City Human Rights Law, viewing similarly worded provisions of federal and state civil rights laws as a <u>floor</u> below which the City's Human Rights law cannot fall." <u>Loeffler</u>, 582 F.3d at 278 (citation omitted).  Even assuming Nolley has made out a <u>prima facie</u> claim of discrimination with respect to his claims, he has failed to show under any reading of the evidence that Swiss Re's proffered reasons for taking adverse actions against him were pretexts for discrimination or that discrimination played any role.


III.  Nolley's Retaliation Claim

Swiss Re also moves for summary judgment on Nolley's claim that Swiss Re retaliated against him for complaining of discrimination.  Title VII makes it an unlawful employment practice for an employer to discriminate against an employee "because he has opposed any practice made an unlawful employment

40

practice by [Title VII], or because he has made a charge . . .
in an investigation" held under Title VII.  42 U.S.C. § 2000e-
3(a).  To establish a prima facie case of retaliation, a
plaintiff must show

> (1) that she participated in an activity
> protected by Title VII, (2) that her
> participation was known to her employer, (3)
> that her employer thereafter subjected her
> to a materially adverse employment action,
> and (4) that there was a causal connection
> between the protected activity and the
> adverse employment action.

Kaytor v. Electric Boat Corp., 609 F.3d 537, 552 (2d Cir. 2010).[6]

Retaliation claims under Title VII are analyzed under the
same burden-shifting framework employed for considering claims
of discrimination.  Id.  Thus, a court considers, first, whether
the plaintiffs have established a prima facie case of
retaliation; second, whether the defendants can articulate a
"legitimate, non-retaliatory" reason for the allegedly

---

[6] The plaintiffs' retaliation claims pursuant to the NYSHRL and
the NYCHRL are subject to the same legal analysis as the
retaliation claims under Title VII in all respects relevant to
this motion.  Fincher v. Depository Trust & Clearing Corp., 604
F.3d 712, 720, 723 (2d Cir. 2010).  While the NYCHRL is
"broader" than its state and federal counterparts in that the
NYCHRL does not require a materially adverse action to maintain
a retaliation claim, id. at 723, it is undisputed that the
plaintiff suffered a materially adverse employment action in
this case.

retaliatory action; and third, whether the plaintiffs have produced evidence that retaliation was "a substantial reason" for the adverse action.  <u>Fincher</u>, 604 F.3d at 720**,** 723.  The plaintiff's burden in making a <u>prima facie</u> claim of retaliation "is <u>de minimis</u>, and the court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive."  <u>Hicks</u>, 593 F.3d at 164 (citation omitted).

It is an unlawful employment practice to discriminate against an employee "<u>because</u> he has opposed any practice made an unlawful employment practice by [Title VII]."  42 U.S.C. § 2000e-3(a) (emphasis supplied).  "Title VII is violated when a retaliatory motive plays a part in adverse employment actions toward an employee, whether or not it was the sole cause." <u>Terry v. Ashcroft</u>, 336 F.3d 128, 140-41 (2d Cir. 2003).  A plaintiff may satisfy the causation requirement in one of two ways: "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant."  <u>Hicks</u>, 593 F.3d at 170

(citation omitted).  "Close temporal proximity between the plaintiff's protected action and the employer's adverse employment action may in itself be sufficient to establish the requisite causal connection between a protected activity and retaliatory action."  Kaytor, 609 F.3d at 552 (emphasis supplied); see also Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 110 (2d Cir. 2010).

An intervening event between the protected activity and the adverse employment action may defeat the inference of causation where temporal proximity might otherwise suffice to raise the inference.  See Freeman v. Ace Tel. Ass'n, 467 F.3d 695, 698 (8th Cir. 2006) (retaliation claim under state whistleblower statute); Kiel v. Select Artificials, Inc., 169 F.3d 1131, 1136 (8th Cir. 1999) (retaliation claim under ADA); Gubitosi v. Kapica, 154 F.3d 30, 33 (2d Cir. 1998) (retaliation in the context of 42 U.S.C. § 1983).

Nolley claims that Swiss Re retaliated against him in two ways after he discussed with Stellwagen, on or about July 11, 2007, his concerns about his role at CMA and accused Bardsley of being "racially biased."[7]  Nolley was issued the PIP on August 16, 2007, and fired on October 5, 2007.  Even assuming that

---

[7] None of Stellwagen's e-mails to Bardsley following the meeting suggest that such an accusation had been made, and Bardsley states that she was never made aware of such an accusation.

43

Nolley has presented evidence of a <u>prima facie</u> case of retaliation, Swiss Re has offered legitimate, nondiscriminatory reasons for each of these actions, as described above in connection with Nolley's discrimination claims.

The burden thus shifts to Nolley to point to evidence that would support a finding that retaliation was a "substantial" factor in the issuance of the PIP and the termination of his employment.  This he cannot do.  First, there is no direct evidence that retaliation played a role in the issuance of the PIP or the termination of Nolley's employment.  In fact, evidence in the record points in the opposite direction.  Even if Nolley did complain about Bardsley's alleged bias to Stellwagen, there is no evidence that Bardsley was informed of Nolley's concern.  Indeed, Stellwagen's comprehensive e-mails to Bardsley describing his conversation with Nolley include no mention of the subject.  Nor is there any direct evidence that Stellwagen sought to retaliate against Nolley.  Within a few weeks of the early July meeting with Nolley, Stellwagen was recommending Nolley as the "perfect person" to handle CMA's graduate recruitment process.

To the extent that Nolley seeks to argue that temporal proximity between his complaint and the issuance of the PIP raises an inference of causation, that inference is defeated by

44

intervening events.  As described above, CMA received

significant negative feedback on Nolley's interpersonal style

from partner search firms.  That perceived deficiency became the

first listed item in Nolley's PIP.  Similarly, the termination

of Nolley's employment was immediately preceded by his

confrontation with Nevins, witnessed by Cook.  Summary judgment

is therefore granted to Swiss Re on Nolley's retaliation claims

under both federal and state law.


Conclusion

     Swiss Re's November 18, 2011 motion for summary judgment is

granted.  The Clerk of Court shall enter judgment for Swiss Re

and close this case.

     SO ORDERED:

Dated:    New York, New York
          March 8, 2012

                                   _____
                                        DENISE COTE
                                   United States District Judge

45

Copies sent to:


James Nolley                          Christopher Lowe
1441 Seminole Road                    Seyfarth Shaw LLP
North Brunswick, NJ 08902             620 Eighth Avenue
                                      New York, NY 10018